The Court took time to advise; and in this term, the justices delivered the following opinions :—
Rossell, J.
Although the present question is of very great importance, both as to the value of the property in dispute, as well as its being the first time it lias been brought before any court in New-Jersey, it is compressed into a small compass, viz: the construction to be put on a single short section of our statute, altering the descent of real estates. Throwing aside all extraneous matter, Ishall take up the third section of that act — and give it, as far as I am able, that examination which its importance requires, and that construction, which law and reason will best warrant.
This section is, in substance, as follows: — “Whereas by the law as it now stands, the issue of an ancestor by one venter cannot inherit to the issue of such ancestor by a different venter, whereby the real estate of such ancestor, in some instances, goes out of the family, to the great injury of the remaining issue of such ancestor; for the remedy whereof — Be it enacted, that if any person possessed of, or entitled to real estate in his p] or her own right in fee simple, shall die without disposing thereof, and without any brother or sister of the whole blood, or any issue of such brother or sister, and shall leave a brother or sister of the half blood, such half blood shall inherit the estate as directed in the first section of the act.”
*158 Under this law, two claims have been set up to the real estate, of Thomas Wright, who died intestate, and seized of the lands in question, which lands he inherited from his father Joseph Wright, who was notoriously possessed of them by and under the will of his father, Joseph Wright the first, mentioned in the verdict before us. One of -these claimants is James Wright, the present defendant in fact, the only surviving son of Joseph Wright the first, and uncle to Thomas, who died seized as aforesaid. The others áre the lessors, of the plaintiff, two half sisters by the mother’s side to the said Thomas, it remains for this Court to decide which of the parties litigant arelegally entitled to the estate.
It is strongly contended, by the- counsel for the lessors of the plaintiff, “that the enacting clause being couched in clear and positive terms, must be literally obeyed, without regard to the preamble;” and in support of this declaration, they have cite'd several authorities, the chief of which go to shew, “that a preamble cannot control the plain enacting clause of a statute, but it is only called in when the intention of the legislature is doubtfully expressed.” But I confess, I cannot find either iii the authorities cited, or in many others which I have carefully searched, any thing which does,away that great fundamental principle, that the clear reason and spirit of a law should govern in its construction. In 1. Blac. 59, we find it laid down, that “The fairest and most rational method to interpret the will of the Legislature is, by exploring his intentions at the time when the law was made.” In page ST, of the same book: “There are three points to be considered in the construction of all remedial statutes, [*] The old law — the mischief — and the remedy ; and it is the business of the judges so to construe the act, as to suppress the mischief, and advance the remedy.”
To shew that this doctrine is correct, we need only look at the practice of Courts of law', and we find them almost invariably pursuing the spirit and meaning of law, in preference’ to the strict letter. The Bolognian law', forbidding blood to be shed in the streets — That of Edward III. prohibiting the purchase of provisions at Rome — The law, cited by Cicero, that those who left a ship in a storm, should forfeit all property therein, with many others, might be named. In all of which,,decisions have been made in direct contradiction to the literal meaning of the law; yet as these decisions were founded on tlie broad basis of immutable reason and justice, they have stood for ages, and the correctness of the principles which dictated them, have never been doubted. But if, indeed, on the contrary, the self-evident intentions of -the Legislature, are not to be regarded; or if, in the present *159 case, the doctrine contended for, by the counsel of the lessors of the plaintiff, is correct,” “That the enacting clause sufficiently explains itself, and must be literally pursued,” it will lead to the most mischievous consequences, as may be readily seen, on reference to the clause itself. The words are sufficiently extensive to take in all persons; they arc positive in favour of the half blood, with but the single exception in favour of brothers and sisters of the whole blood, and their issue ; so that if a person having children, and possessed of real estate, should die without disposing thereof, and without brother or sister of the whole, but leaving a brother or sister of the half-blood, by pursuing the literal meaning of the words, in which the clause is clothed, such half-blood would inherit the estate, to the entire exclusion of the children of the intestate. Yet could any court or jury be found to give such a construction to the act? I think not, and for this plain reason, none could for a moment suppose, [*] that the Legislature could possibly intend' such monstrous injustice.
If then, we can discover, either in the preamble or elsewhere, the unequivocal meaning of our Legislature, at the-time of passing the act under consideration, this Court is-bound to carry that meaning into effect; although, as laid down in the books, “such construction seems contrary toi the letter of the statute.”
In the strictness of feudal times, none but lineal descend- and could inherit real estates ; when that rigour somewhat' abated, collateral relations were let in, and this has continued to the passing of the present act of 1780, regard being always had to the right of primogeniture, and to the line of the whole blood by which an estate descended; but as the reason which gave to the eldest son, the whole estate, had long ceased, our Legislature, in the first section of the-act altering descents, directed that all the sons of an ancestor, dying intestate, should equally share his estate. But still these brethren of one father, by different venters, could not inherit to each other, whereby the estate of such ancestor sometimes went out of his family. To remedy this evil, was the intention of the Legislature, in the third section of' the act. This intention is not left to vague and uncertain-conjecture, on merely probable grounds, but is reduced to an absolute certainty, and that by the best of all possible proofs,, the positive declarations of that body themselves; and we-cannot be at a loss in exploring intentions so manifestly set forth as in the preamble to this section.
If then, this estate, late Thomas Wright’s, should pass to. his half sisters, by the mother’s side, total stranger’s to the- *160 blood and family of J oseph Wright, the first purchaser, to the exclusion of James Wright, his son, would not this be the identical mischief complained of under the old law, and which the present act was declaredly intended to prevent? I think this is beyond doubt.
'[*] If,' indeed, Thomas Wright, the person last seized, had himself acquired the estate in question, I should be of opinion, that his half sisters, the lessors of the plaintiff, would be entitled to the estate. For this would not contradict the "express intentions of the Legislature; and as by the words of the act, they are literally included, the preamble cannot restrain or control them. And thus far, and no farther, Í conceive, does' the authorities cited by the counsel for the plaintiff, go to prove, that the preamble shall not restrain the enacting, clause, (a)
On the whole, after the most serious consideration of this ■question, that I ,have been able to give it, I am of opinion, that the postea be delivered to the defendant.
Kirkpatrick, C. J.
— Said that he had always considered the object and design of the Legislature, in making the act under consideration to be, that of providing for the descendants of ancestors having children by two venters ; that the estates of such ancestor should not be taken from their own children, and carried to a remote relation; and lie was of opinion, that it ought to be confined to that object, and not extended beyond it. He therefore, concurred with his brother Rossell, that judgment be rendered for the defendant.
Pennington, J.
— I feel a diffidence on this occasion, in differing in opinion with my brethren: but whatever the convictions of my mind are, I am bound in duty to declare •them. The case is shortly this. Joseph Wright, mentioned in the special verdict as Joseph Wright the first, was .seized of a considerable real estate, and also possessed of personal property, and. died leaving three sons and five daughters. To his son Joseph, that is, Joseph the second, .he by will, gave a money legacy of two hundred pounds; ■and also a mulatto boy. To James, (under whom the defendant claims, and who is in reality the defendant,) and to Thomas, that is, Thomas Wright the first, he gave each a plantation. But they being minors, he further provided, that in case of either of their deaths under age and without issue, the plantation devised to him so dying, should [*] go to Joseph. Te the daughters he gave the remainder of his *161 personal property. Thomas died under age, and without issue; of course Joseph entered as devisee in remainder, and died intestate, seized of the premises in question, leaving one* son, Thomas Wright the second, by Lydia his wife. On the death of Thomas without issue, James the real defendant in this cause, entered upon the premises, and claims title thereto, he being the paternal uncle of Thomas, who died seized, and his heir at the common law; and if the finding of the jury went no farther, would unquestionably be entitled to the estate. But the jury further find, that Lydia, the mother of Thomas, after the death of her husband Joseph the second, the father of Thomas, intermarried with one Bilderback, by whom she had Margaret, one of the lessors of the plaintiff; and further, that on the death of Bilderhack, she afterwards intermarried with one Fox, by whom she had Ann, the other lessor. These children of Lydia, claim the estate, under our act of Assembly, Paterson 44, as being sisters of the half blood, to Thomas, who died seized without leaving any issue, or brothers or sisters of the whole blood; and the words in the enacting clause, in terms, take in the case of the lessors of the plaintiff. In opposition to this, the defendants counsel contended, that this case does not come within the meaning and intention of the Legislature, which meaning and intention, they say, is to be found in the preamble to the enacting clause of the statute, which evidences an intent only to provide for the children of an ancestor by different venters. That the word venter made use of in the preamble, is peculiarly adapted to females, and shews the intent of the Legislature to extend the provision, to children of the half blood, proceeding from the same father by different wives, and no farther. That a statute, making use of a word that hath a common law meaning, the word shall he received in a common [*] law sense, and apply tliis doctrine to the word venter. This rule of construction is, no doubt, a sound one; but Lord Coke, in his commentaries on the 7th section of Littleton, cited by the counsel for the defendant, 1 Institute 14, says, that this is put as an example; the general principle of the common law is, that the half blood shall not inherit; and the word venter is made use of in explaining the doctrine. It cannot be denied, I think that at the common law, in case a woman seized in fee simple of a real estate, should marry one man and have a son, and on the death of such husband, should marry another and have another son, and then die, and the eldest son should *162 enter on the premises and die seized, hut that the son by the second husband could not inherit; for this would militate against the sixth canon of descent; there can, therefore, be nothing in this distinction. I have here first noticed it, that it need not perplex the subject as I progress.
No doubt but that the meaning and intention of the Legislature is, to govern the construction of statutes; but great difficulties frequently arise in finding out the real meaning and intention of the Legislature; the words of the statute are certainly the medium by which to discover such intent? and plain unambiguous words in all common or ordinary cases, are sufficient to satisfy any reasonable mind, and the safest and surest guide. But cases will arise, when the plain unequivocal words in a statute, may be contradicted by words equally plain, in another or the same statute; or may be against the manifest intent of the Legislature, evident from the general scope and design of the statute, or may lead to gross absurdity or manifest injustice, which it cannot reasonably be supposed that the Legislature intended. In such cases, courts have, but as I apprehend with much caution, departed from the strict letter and resorted to the next best evidence, of the intent of the law maker. It is not, I believe denied, but the enacting clause is plain and explicit; but it is alledged that the preamble, which is part of the statute, shews [*] an intent different from that expressed in the enacting clause; and that in the present case, taking the words of the enacting clause as they stand, they will create the very mischief which the Legislature intended to remedy. It may be useful to inquire how far this is the case.
The preamble states, that as the law now stands, the issue of an ancestor by one venter, cannot inherit to the issue of such ancestor by another venter, whereby the real estate of an ancestor in some instances goes out of the family, to the great injury of the remaining issue of such ancestor.
The word family, must here be understood, tiie issue of the ancestor spoken of, that is, an ancestor having children by two venters, otherwise it would have no meaning, or it would be against truth; for the law, as it then stood, did not take it out of the family, but only gave it to a more remote branch of the family. The plain meaning of the preamble, then is, that as the law now stands, in some instances, the estate of an ancestor having issue by two wives, or two. husbands, is by excluding the half blood from inheriting to each other, carried from the children of such ancestor to a more remote relation, a brother, sister, or perhaps an uncle or nephew. It was to remedy this mischief, that the law was passed, which in substance enacts, that in case any *163 person die intestate, seized in his or her own right in fee simple, of any real estate, without leaving any brother or sister, or issue of such brother or sister of the whole blood, then the estate shall descend to the brothers and sisters of the half blood, if any there be, in the same proportion as in ■other cases, thus laying down a general rule. Taking the intent of the Legislature from the preamble, the design was to enable the issue of an ancestor, having children by different wives or ■different husbands, to inherit to ther.hildren of the same ancestor, notwithstanding the disqualification of the half blood, so rigorously adhered to by the maxims of the common law, and thereby prevent the estate from going from the children of such ancestor, to a more [*] remote relation. Let us apply this to the case under consideration, and see if this intent is violated, in permitting the lessors of the plaintiff to inherit to their half brother. It is to be kept in mind, that the ancestor spoken of in the preamble, is an ancestor having children by different venters, any other ancestor seems to be disregarded. It will strip the case of matter which only serves to encumber and perplex it, if we consider Joseph Wright the second, as the acquiring ancestor, which is really the case, he received the estate by devise from his father; of course he comes in as purchaser, and not by descent; he acquired a new fee. There is no estate required to be taken from the children of an ancestor, having children by two venters; for Joseph Wright the second, the acquiring ancestor, from whom the estate descended, had not children by different venters. Lydia was his only wife; and should we go back for an ancestor to Joseph the first, it would not alter the case, for even he, did not have children by different wives. Then it cannot be said, that the statute, in application to the present case, will cause an evil it was intended to remedy; nor that the intent of the Legislature will be violated by adhering to the construction contended for by the counsel for the plaintiff.
But it is further said, by the counsel for the defendant, that this case docs not come within the mischief, particularly pointed out by the preamble of the statute, to be remedied, and that therefore, the common law manner of descent must prevail. The fact is so; but does the consequence follow? If appears to me, to be a settled principle of law, that the preamble cannot control the enacting part of the statute, in cases where the enacting part is expressed in clear, unambiguous terms; but in case any doubt arises on the enacting part, the preamble may be resorted to, to explain it, and shew the intention of the law maker. The enacting part of this statute is clear and explicit; there is no ambiguity *164 on the face of it. Shall we then go out of the enacting [*] part, which is clear and intelligible, and resort to the preamble, to create an ambiguity, and then have recourse to this same preamble, to explain this ambiguity? It appears to me, that this would be carrying the office of the, preamble beyond any thing heretofore contemplated, by giving it a paramount authority to the enacting part of the statute itself. But the difficulty in the case is not, that the enacting clause hath created the evil it was intended to cure, or that the words of the act are repugnant to the intent of the Legislature, as evidenced’by the words of the preamble, but that the enacting clause has gone beyond the particular intent expressed in the preamble; it, therefore, comes to this: Will the generality of the language, clearly and unambiguously expressed in the exacting clause of the statute, be restrained or narrowed by'a particular.intent recited in the preamble? It is laid down in 8 Mod. 144, that it is no rule in construing statutes, to confine the general words of the enacting part, to any particular words, either introductory to it, or to any such words even in the preamble itself. The Court there say, that it is true, Lord Coke commends a construction that agrees with the preamble, but not such as may confine the enacting part to it. Lord Holt, in 6 Mod. 62, is made to say, that the. preamble is no part of the statute. We read in 6 Bacon, 381, that the preamble of a statute is. no more than a recital of some inconvenience, which does not exclude any other, for which, a remedy is given by the enacting part; and that the generality of the words of the enacting clause, must not be restrained by the preamble. Lord Cowper, in full and unequivocal terms, recognizes the same doctrine, 1. P. Wil. 320. It is true, that Lord Chief Baron Parker, and Lord Hardwicke, in the case of Ryal v. Rowles, 1. Atk. 175, 182, attempted to qualify the general rule in the construction of a particular act, in a case where injustice to an individual, and ruin to the mercantile business, would follow from a rigid adherence to the letter of the act. I cannot think this case a .sufficient authority for me to [*] depart from the general rule, especially as it does not come within the reason on which the opinion of those respectable judges was founded. Preambles are often very loosely drawn, and not very minutely attended to, by the members of the Legislature, in giving their assent to a law. The enacting clause being reasonable and proper, is, in all ordinary cases, sufficient to gain their approbation and assent to an act. But may not the Legislature have had a farther intent, than what is expressed in the preamble? May it not have considered that *165 the absolute fee being in the person last seized, that a brother or sister of the half-blood was, in reality, a nearer kindred than an uncle or more remote relation of the whole blood? Where the estate hath been acquired by the person last seized, it is certainly the most reasonable and satisfactory rule; and it is no way extraordinary, that the Legislature, preferring simplicity in rules of descent, wherein our law so much delights, should not think proper to prescribe a different rule of descent in cases where the estate w:as cast upon the person last seized, by inheritance, or where he acquired it by actual purchase. The common law itself hath undergone a change in this respect ; as the law of inheritance anciently stood, it became necessary to make out the pedigree of an heir from the first donee or purchaser ; and to show that the person claiming the inheritance, was his lineal representative. This being difficult, and in many cases impossible, a new rule was adopted, to wit: that the claimant be next of the whole blood, to the person last seized; this total exclusion of the half-blood, Mr. Justice Blackstone says, is almost peculiar to our law, and was looked upon as a strange hardship, by those unacquainted with the reasons on which it was grounded,* and I think I may with truth, add, by many of those who are. It is evident that the Legislature meant to change this rule, so far as it respected the exclusion of the half-blood, and to lay down a new one; in doing of it they have made it general, and [*] under the best view 1 have been able to give the subject, I cannot think this Court authorized to narrow or restrain it; nor that the words of the enacting clause being clear, explicit, and unambiguous, laying down with simplicity and perspicuity, a new rule or canon of descent, can be restrained or limited by reason of the language of the preamble not expressing an intent co-extensive with the words of the enacting clause, but not repugnant to them. Rules of descent are, from their nature, arbitrary, and cannot be moulded by Courts of law, to meet the equity of every particular case. Whether the legislature, in correcting the common law in this respect, would not have acted wiser in adopting the idea of Sir William Blackstone, by ordaining that the half-blood might inherit, in cases where the estate notoriously decended from its own proper ancestor, but not otherwise, † wras a question for it to decide, and not for this Court. Nor can 1 perceive that the hardship, on the part of James Wright, is so grievous, as was in a handsome manner pressed upon the court, in the pathetic and elegant *166 appeal to the feelings of the heart, by one of his counsel, at the close of his argument; he has already received his portion of his father’s estate; he is now in pursuit of another portion, originally allotted to a brother, and which after-wards descended to a nephew. The sympathy of the Court, if admissible at all, might, with more propriety, have been excited in favour of his five sisters, or their decendants, who, in all probability, have received a very small portion of their father’s possessions : be that, however, as it may, it has nothing to do with the case; when sympathy and compassion come to be substituted in the place of established principles of law, property will not be worth acquiring or defending; all that can be said to him, in this respect is, that so the law is written.
[*] I am of opinion, that the plaintiff is entitled to judgment. Judgment for defendant.

 Vide post 481. 2 South. 862. Half-blood inherit to intestate's land given, by her, and not their father.

He left another son, James, who died an infant, in the life time of Thomas, which does not alter the case.

 2 Blac. Com. 228,

 2 Blac. Com. 233.